**NOT FOR PUBLICATION**

**FILED**
JAMES J. WALDRON, CLERK

**JULY 14, 2014**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ *Ronnie Plasner*
JUDICIAL ASSISTANT

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

In Re:

**126 LLC,**

Debtor.

Case No.: 12-35157 (DHS)

Judge: Donald H. Steckroth, U.S.B.J.

**OPINION**

**APPEARANCES:**

Hodgson Russ LLP
Heidi J. Sorvino, Esq.
1540 Broadway, 24th Floor
New York, New York  10036-4039
*Counsel for Debtor*

City of Newark
James A. Rybka, Esq.
Assistant Corporation Counsel
Department of Law
920 Broad Street
Newark, New Jersey  07102
*Counsel for City of Newark*

Ansell Grimm & Aaron PC
James G. Aaron, Esq.
1500 Lawrence Avenue
CN7807
Ocean, New Jersey  07712
*Counsel for W.A.S. Terminals Corp.*

Donald F. MacMaster, Esq.
Office of the United States Trustee
One Newark Center
Suite 2100
Newark, New Jersey  07102
*United States Trustee*

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

This is the Court's decision with respect to the hearing ("Hearing") held July 8, 2014, in which the debtor, 126 LLC ("Debtor"), sought to have this Court fix the fair market value of the Debtor's real property located at 126 Passaic Street, Newark, New Jersey 07104 (the "Property"), which was the subject of an auction sale and subsequent hearing before this Court approving such sale on May 5, 2014. The sale of the Property was conducted under Section 363 of the Bankruptcy Code and was offered free and clear of liens, valid liens to attach to the proceeds of sale. See 11 U.S.C. § 363. The purpose of the Hearing concerned determination of the value of the Property and thus, in essence, sought to fix the secured amount of the lien asserted by the City of Newark (the "City") in the sum of almost $1,400,000, roughly one half of which is for unpaid real estate taxes with the balance for water and sewer rents.

The Debtor's original motion sought to disallow portions of the City's claim, but after conferences and adjournment of the original application, the Hearing morphed into one regarding the value of the Property so that, pursuant to Section 506(a) of the Bankruptcy Code, the value of the collateral may be determined to fix the City's secured portion of its claim. The City objected and participated in the Hearing. The Debtor argues that the Hearing is vital to the successful liquidation of the Debtor's assets, a proposed settlement with W.A.S. Terminals Corp. ("W.A.S."), and the successful remediation of the Property. The only matter before the Court on this Hearing is the valuation of the Property and the determination of the secured status of the City's claim under

11 U.S.C. § 506 of the Bankruptcy Code. The City has reserved all rights, as has the Debtor, with respect to the extent of the total claim made by the City.[1]

Some background is necessary. The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on October 16, 2012, which was subsequently converted to a case under Chapter 11. Bar dates for filing proofs of claim were established by notice with the deadline for governmental units being April 14, 2013. The City has not filed a proof of claim in this case.[2] The Debtor commenced an adversary proceeding against W.A.S. seeking to determine the extent of W.A.S.'s lien, to which W.A.S. filed various counterclaims against the Debtor. After extensive litigation, the dispute has been settled with the parties agreeing to settle all claims ("Settlement"). As part of the Settlement, the parties agreed that upon closing of title and any sale of the Property, the Debtor would release its insurance proceeds to the buyer in order to complete environmental remediation of the Property, as required by the New Jersey Department of Environmental Protection ("NJDEP") and other governmental agencies.

In February 2014, the Debtor submitted a motion seeking bidding procedures and authorizing the sale of the Property free and clear of liens, claims, interests, and other encumbrances (Docket No. 136). On April 30, 2014, the Debtor conducted a Court-directed auction for the sale of the Property ("Auction"). At the Auction, Meadowlands Ventures LLC ("Meadowlands") submitted the highest and best offer for the Property. On May 5, 2014, the Court conducted a sale hearing and approved the sale of the Property to Meadowlands. The City did not oppose the motion authorizing

---

1 The parties each submitted letters after the Hearing. While the record has been closed on the Hearing, the letters were considered by the Court.
2 The City as a secured creditor does not have to file a proof of claim. *See* 11 U.S.C. § 501(a); *U.S. Nat'l Bank in Johnstown v. Chase Nat'l Bank of New York City*, 331 U.S. 28, 33 (1947) (a secured creditor may disregard bankruptcy proceedings, decline to file a proof of claim, and rely solely upon its security).

the sale of the Property, did not attend the auction sale, and did not oppose either orally or in writing the approval of the sale of the Property to Meadowlands.

At the Hearing, the Debtor contended the Property has a value of $225,000 and offered four witnesses, each subject to cross-examination. The first witness, Thomas MacIntyre, the terminal manager for the Property for the past six years, testified as to environmental spills at the Property, the "horrible" physical condition of the Property, and the fact that the bulkhead deteriorated and fell into the Passaic River a month before Storm Sandy in October 2013, has not yet been repaired, and is essential to the operations of the Property. He further testified that there are no ongoing operations at the site. He testified that the estimates obtained for bulkhead repair approximate $1,600,000 and that there was widespread contamination on the Property.

The second witness, Keith Savel, is president of Prime Environmental, Inc., a remediation company operating in New Jersey and New York, and is a licensed certified site remediation expert in New Jersey. His company was retained as property site remediation expert and has remained in contact with the NJDEP and United States Environmental Protection Agency ("EPA") relative to the remediation of the Property. His report dated July 8, 2013 was admitted into evidence as D-1 and provides estimated costs for the remediation of the Property. It estimates the cost of remediation as between $3,800,000 and $4,265,000 based on remediating the Property to residential standards (the highest level) and estimated costs between $1,140,000 to $2,985,000 for remediation to industrial standards (a restricted use approach). He testified further that there was some excavation done on the Property in November-December 2013, after Storm Sandy, and that the contaminated soil is stockpiled on the Property. Finally, he testified that D-1 in evidence was prepared prior to the

5

bulkhead falling into the Passaic River so the estimate for repairs or remediation contained in the report does not include the cost of bulkhead repair.

The third witness was Jacob Landau, manager of the Debtor, who testified he oversees the Property. He testified that he received several offers for the purchase of the Property for essentially one dollar because of the widespread contamination and the necessity to spend considerable funds for remediation. He identified the agreement for the sale of the Property with Meadowlands (D-2 in evidence), which set forth the purchase price of $1,600,000 obtained at the Auction sale, and the fact that the Debtor had placed $250,000 in escrow to be given to any purchaser of the Property as an advance for remediation costs.

Finally, the Debtor introduced the testimony of Jeffrey Hubbard, president of Madison Hawke Partners LLC, the retained real estate broker for the Property. He testified to the national, regional, and local marketing efforts made with respect to the Property for multiple uses, both residential and industrial. He testified to the extensive media, print, and direct mail solicitation of the Property for sale. He is the author of Madison Hawke's Report to the Court dated May 1, 2014, marked D-3 in evidence, and which discusses at great length the scope of the marketing and sale effort. The report demonstrates an extensive marketing effort for Property of this value. He testified such effort was made necessary because of the remediation required for the Property. Succinctly stated, he testified that over 1,700 inquiries were made from separate parties, an online due diligence room with copies of environmental reports, court orders, NJDEP and Coast Guard correspondence, etc. was made available, and disclosure of insurance proceeds for cleanup was identified. Mr. Hubbard further testified that the purchase price of the Property was directly related to the cleanup costs, the availability of insurance proceeds for that purpose, and that the availability of insurance

6

proceeds was announced at the Auction sale. In his opinion, the insurance proceeds created the value in the Property. He testified three qualified bidders appeared at the Auction, there was competitive bidding, and that $1,600,000 was the highest and best offer.

James Aaron, counsel to W.A.S., represented to the Court that there was $1,125,000 in his attorney trust account pursuant to the Settlement of the Debtor W.A.S. litigation which, at the time of closing, will go into an environmental remediation fund in the name of the buyer to assist funding the remediation on the Property.

Section 506(a) of the Bankruptcy Code provides, in pertinent part, that:

> "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . that is less than the amount of such allowed claim . . . ."

This section allows for bifurcation of liens into secured and unsecured claims determined by the value of the property in issue. Bifurcation of secured claims is routinely undertaken in this Court pursuant to Section 506. Its application is well established and does not exclude municipal tax liens as suggested by the City. No such exception is found in the Bankruptcy Code. *See In re Lindsey*, Case No. 01-20724, Civil Action No. 02-4412 (D.N.J. June 12, 2003) and cases cited therein.

The City's reliance upon *In re Florida Engineered Constr. Prods. Corp.,* 157 B.R. 698 (M.D. Fla. 1993) is misplaced. That case considered whether taxes on real and personal property which accrued during the year a debtor's petition is filed qualify for treatment as administrative expenses under section 503(a)(1)(B) of the Bankruptcy Code and not whether the municipal tax claim could be bifurcated under section 506(a) of the Bankruptcy Code.

The issue in *Florida Engineered* was aptly described by the Court as:

7

> [t]he real issue, which is whether or not property taxes on real or personal property accruing during the tax year when the petition was filed and owed by the Debtor may be accorded administrative claim status pursuant to § 503 of the Bankruptcy Code."

*Id.* at 699.

In terms of fixing valuation, "[a] fair valuation of an entity's property refers to the amount of cash that could be realized from a sale of the property during a reasonable period of time." *United States v. Basroon*, 38 F. App'x 772, 776 (3d Cir. 2002). A fair "valuation must be analyzed 'in a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming a 'willing seller' and a 'willing buyer.'" *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193-94 (3d Cir. 1998). A "fair valuation" of the Debtors' assets requires that we "estimate . . . what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value." *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 621 (Bankr. E.D. Pa. 1989*) aff'd sub nom. In re Joshua Slocum Ltd.,* 121 B.R. 442 (E.D. Pa. 1989) (citing 2 COLLIER, ¶ 101.31, at 101–86).

In *In re Kara Homes, Inc.*, 06-19626 MBK, 2012 WL 6150377 (Bankr. D.N.J. Dec. 11, 2012), the District of New Jersey rejected a creditor's argument that a public auction is not determinative of the fair market value of debtor's assets, holding that the court would accept "the amount of a credit bid from a sophisticated business entity, which knowingly had the option to bid more or less, as evidence of the fair market value of the property." The court noted that an "after the fact judicial re-creation of a market sale, through appraisal testimony and analysis, is not warranted where the circumstances of the sale reveal adherence to state law procedures and competitive third party bidding." *In re Kara Homes, Inc.*, 2012 WL 6150377 (citing *In re Denaro*, 383 B.R. 879, 887 (Bankr. D.N.J. 2008)) ("Under the circumstances presented herein, with competitive bidding after advertising consistent with state law, the Sheriff's Sale constituted a market, in and of itself,

sufficient to establish a fair market valuation for the Property."). The *Kara Homes* court "chose to place greater weight on actual bidding results at a court-approved sale in lieu of an 'after the fact' judicial re-creation of fair market value." *See In re Berley Assocs., Ltd.*, 492 B.R. 433, 440 (Bankr. D.N.J. 2013) (characterizing the *Kara Homes* decision, and noting "this Court has previously observed that competitive bidding is a central factor in analyzing the fairness of a sale transaction and the value of the underlying property").

Here, the testimony as to value of the Property is compelling. The Property was sold at public auction with competitive bidding after extensive marketing by an experienced mortgage broker. (See D-3 in evidence) The price at the auction sale was $1,600,000 subject to the Debtor's credit or give-back to the purchaser of $250,000 for site remediation and, most significantly, the purchase was conditioned upon environmental insurance proceeds in the sum of at least $1,100,000 being available for site remediation. Thus, with the sale price of $1,600,000, less credits to the purchaser of $250,000 and $1,125,000, already placed in an environmental trust, $225,000 represents the market value of the Property. Thus, this is the value of the collateral for the secured portion of the City's claim. The balance of the City's claim shall be treated as an unsecured general claim.

The City offered no testimony as to the value of the Property, which is its collateral for its lien. It did object at the Hearing, asserting that, in its view, the best test of value would be an independent appraisal of the Property, although the City did not offer such an appraisal. The Court disagrees with that contention and finds that a fair valuation must be analyzed in light of the marketplace and assumes a willing buyer and a willing seller. Certainly, under the circumstances

here, with competitive bidding after extensive advertising, the Auction sale constituted a market sufficient to establish fair value for the Property. *In re Berley Assocs., Ltd.*, 492 B.R. at 440.

With the Property value being fixed, the sale brings together the remediation of the Property to the benefit of everyone, including the City, who is allowed to have the secured portion of its lien fixed to the extent of its collateral and the balance of its claim fixed as an unsecured claim in the proceeding. I recognize that there may still be objection to the balance of the unsecured claim as all parties have reserved their rights. In the event the parties cannot agree on the extent of the unsecured claim, the Court should be advised and a hearing will be set as to that issue.

For the aforesaid reasons, the value of the Property is as fixed by the market at the time of the auction sale, taking into account the credits provided by the Debtor and the insurance proceeds available, all of which were conditions of the sale. Accordingly, the value of the collateral for the City's secured lien is determined to be $225,000.

*s/ Donald H. Steckroth*
_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: July 14, 2014